IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GISELLE ERGO, CINDEE SAENGER,
ERICA BARTELMEY, LISA PRATALI,
and RHONDA ANDRES,

        Plaintiffs and
        Counter-Defendants,

        v.

INTERNATIONAL MERCHANT
SERVICES, INC., and CHRIS
KAZOR,

        Defendants and
        Counter-Plaintiffs.

Case No. 04 C 6789

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Before the Court are Cross-Motions for Partial Summary Judgment. Plaintiffs Giselle Ergo ("Ergo"), Cindee Saenger ("Saenger"), Erica Bartelmey ("Bartelmey"), Lisa Pratali ("Pratali"), and Rhonda Andres ("Andres") seek judgment on several of their claims under the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. §§ 201 *et seq.*, the Illinois Minimum Wage Law (the "IMWL"), 820 ILCS 105/1 *et seq.*, and the Illinois Wage Payment and Collection Act (the "IWPCA"), 820 ILCS 115/1 *et seq.*, as well as on Defendants' counterclaim. Defendants International Merchant Services, Inc. ("IMS"), and Chris Kazor ("Kazor"), seek judgment on Plaintiffs' retaliation claims under the FLSA and the IMWL, as well as on Plaintiffs' IWPCA claims related to accrued vacation time.

For the following reasons, Plaintiffs' Motion is **GRANTED IN PART** and **DENIED IN PART,** and Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART.**

## I.   OVERVIEW

The following general factual summary is based on the pleadings and undisputed facts, unless otherwise indicated.  More specific factual recitations will be provided during the relevant sections of this opinion.

This dispute arises from the Plaintiffs' employment with Defendant IMS.  IMS is an Illinois-based electronic merchant bank card processor that also sells credit card processing equipment, supplies, and software.   Defendant Kazor is IMS's president, CEO, and sole owner.  Each of the plaintiffs worked in IMS's "Internal" department for between three and six years:  Plaintiff Andres from November 15, 1999, to September 30, 2002; Plaintiff Bartelmey from March 29, 1999, to March 4, 2002, and then from November 4, 2002, until April 6, 2004; Plaintiff Ergo from February 23, 1999, until August 5, 2004; Plaintiff Pratali from September 14, 2001, until August 5, 2004; and Plaintiff Saenger from December 11, 1997, until August 5, 2004.

Plaintiffs' claims relate to their compensation at, and to the circumstances of their departure from, IMS.  Plaintiffs claim that IMS violated overtime compensation laws by failing to pay them time-and-a-half pay for all hours worked over 40 per week.

Plaintiffs also claim that IMS violated wage laws by failing to pay Plaintiffs certain other agreed-upon wages and by withholding certain amounts from them after their departures from IMS. Finally, Plaintiffs claim that IMS fired, constructively discharged, or otherwise discriminated against them in retaliation for their complaints about the above alleged practices.

For their part, IMS and Kazor claim that Plaintiffs owe IMS money because, on a number of occasions, Plaintiffs cashed paychecks from IMS that they knew represented overpayment for hours actually worked. Plaintiffs contend that this claim by Defendants, along with a threatened-but-never-filed claim for defamation, are baseless and constitute further acts of retaliation.

## II.  DISCUSSION

### A.  Plaintiffs' Motion For Partial Summary Judgment

Plaintiffs claim summary judgment on their FLSA and IMWL claims, on part of their IWPCA claim, and on Defendants' counterclaim. Specifically, Plaintiffs seek summary judgment on Counts I and II of their complaint, which state affirmative FLSA and IMWL claims arising from Defendants' alleged failure to pay Plaintiffs overtime by first artificially capping the number of overtime hours for which they would pay employees, including Plaintiffs, and then by wrongly reclassifying employees, including Plaintiffs, as exempt from overtime pay requirements. Plaintiffs also seek summary judgment on Count IV, which states a claim under

the IWPCA arising from (a) Defendants' alleged breach of an agreement to pay Plaintiffs additional wages for hours over 37.5 per week during the period when Plaintiffs were classified as exempt from overtime requirements and (b) Defendants' failure to pay Plaintiff Bartelmey her final paycheck. Plaintiffs additionally seek summary judgment on Defendants' counterclaim on the grounds that Defendants have failed to establish breach of contract, and that the "voluntary payment" doctrine precludes recovery.

### 1. Plaintiffs' Affirmative FLSA and IMWL Claims (Counts I & II)

As Plaintiffs' complaint presents two unpaid overtime claims that each arise from a distinct set of facts, the Court will address each claim separately.

#### a. Claim Related To Plaintiffs's Classification As Non-Exempt

IMS initially classified each Plaintiff as an hourly, nonexempt employee. It is undisputed that: Andres was nonexempt from November 15, 1999, to January 14, 2000; Ergo was nonexempt from February 23, 1999, to December 5, 2002; Saenger was nonexempt from December 11, 1997, until November 2002; Bartelmey was nonexempt from March 1999 through March 2002, as well as in November 2002; and Pratali was nonexempt from September 14, 2001, to February 11, 2004.

Plaintiffs' claims regarding the nonexempt periods of their employment relate to what they refer to as IMS's "44-hour cap." It is undisputed that in early 2002, IMS office manager Katie Anderson informed Ergo, Saenger, Bartelmey and Pratali that IMS was instituting a policy of limiting their work week to 44 hours. Plaintiffs claim that Anderson stated that the reason for the cap was that Plaintiffs were "milking the company for overtime." According to Plaintiffs, the cap meant that IMS would not pay them for hours worked beyond 44 per week, even though IMS expected them to work more than 44 hours if they had not completed their work. Plaintiffs support their testimony with payroll documents and summaries thereof. One particular unsigned handwritten note purportedly shows the hours of certain employees, including some of the Plaintiffs, with "44" marked next to each employee that had worked more than 44 hours.

According to Defendants, the cap was simply a limit on work, not a limit on payment. Defendants contend that although IMS instructed Plaintiffs not to work more than 44 hours, its policy and practice was to pay all employees for all overtime hours, including those over 44. According to Defendants, the primary consequence for an employer who worked more than 44 hours was that Anderson would speak to her about it and instruct her not to do so in the future. Defendants do acknowledge that IMS underpaid some of the Plaintiffs on a few of the occasions that they worked over

44 hours. But Defendants contend that these were inadvertent errors, and that IMS also inadvertently overpaid Plaintiffs on many occasions, which Defendants seek to prove by submitting their own payroll record summaries.

The Court concludes that genuine issues of material fact preclude summary judgment on the 44-hour cap issue. While it is undisputed that IMS instituted a policy of restricting overtime in excess of 44 hours, it is disputed whether this was a cap on the amount *worked* or the amount *paid*. At his deposition, Defendant Kazor flatly denied the existence of a payment cap. Meanwhile, Anderson's testimony was at most ambivalent. She testified that "the threat was there" that employees would not be paid for working more than 44 hours but that she never put this threat in place and that, to her knowledge, IMS always paid employees for working more than 44 hours.

The documents likewise do not resolve the issue. The question of whether IMS failed to pay Plaintiffs for hours worked beyond 44 per week depends on calculating during which weeks they actually worked more than 44 hours. But the parties dispute this sub-issue, each employing different source materials and methods of calculating hours worked. And while Plaintiffs' handwritten payroll document is probative of a payment cap, its weight is limited, given that its authorship is unknown and it relates to

only one pay period.  In sum, evidentiary conflict and ambiguity requires this issue to be weighed by the trier of fact.

### b. Claim Related To Plaintiffs's Classification As *Exempt*

After initially classifying each Plaintiff as nonexempt, IMS reclassified each of them to exempt status, which they each held until their respective departures from the company.  IMS reclassified Andres in January 2000, Saenger in November 2002, Ergo and Bartelmey in December 2002, and Pratali in February 2004.

Defendants claim that during this period, IMS properly reclassified Plaintiffs as exempt because they had become "bona fide executive, administrative, or professional" employees.  *See* 29 U.S.C. § 213(a)(1).  According to Plaintiffs, Defendants in actuality reclassified Plaintiffs despite there having been no significant change in any of their job duties for the sole purpose of avoiding paying them overtime.  Plaintiffs advance several arguments in support of their misclassification claim, but the Court need only address one, as it is dispositive.

In order to meet its burden of establishing the overtime exemption, an employer must show, *inter alia*, that it paid the relevant employee on a "salary basis."  29 C.F.R. § 541.2(e).  This in turn requires showing that the employee "regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or

quantity of the work performed."  29 C.F.R. § 541.118(a).  Courts
have specifically interpreted the phrase, "subject to reduction,"
to mean that the exemption is unavailable if the employer deducts
from the employee's pay for violations of non-safety-related rules
or partial-day absences.  *Piscione v. Ernst & Young, L.L.P.*, 171
F.3d 527, 534 (7th Cir. 1999).  Under this "no-docking" rule, the
employer need not have actually deducted the employee's pay, so
long as "there is either an actual practice of making such
deductions or an employment policy that creates a 'significant
likelihood' of such deductions."  *Auer v. Robbins*, 519 U.S. 452,
461 (1997).

Here, summary judgment is appropriate because the undisputed
facts show that IMS maintained a practice of subjecting Plaintiffs
and other nominally exempt employees to improper deductions for
discipline or partial-day absences.  To begin with, IMS's employee
handbook – which applies to all IMS employees, making no
distinction between exempt and nonexempt employees, sets forth a
"progressive discipline" policy that provides for "suspension **(with
or without pay)**" as one of five steps IMS may take in disciplining
employees.  (emphasis added).  The handbook articulates at least
three specific circumstances meriting suspension without pay, none
of which involve violations of major safety rules:  making personal
use of IMS phones, serial tardiness, and failure to comply with
IMS's dress code.

The undisputed facts further establish that IMS implemented its docking/suspension policy against Internal department employees, including at least two of the Plaintiffs. Specifically, IMS suspended Ergo without pay on April 10, 2004, for "failure to follow company procedures" arising from an "inappropriate" exchange Ergo had with another employee. IMS likewise suspended Bartelmey without pay for four days in April 2004 for violation of the company's internet usage policy. IMS further deducted Bartelmey's pay for partial-day absences on at least five occasions: July 2, 2003; August 1, 2003; the week of September 5, 2003; the week of January 9, 2004; and March 15, 2004. The record additionally shows that five other Internal department employees faced deductions despite having been classified as "exempt."

Defendants defend their classification of Plaintiffs by relying on the case of *Auer v. Robbins*, where the Supreme Court upheld an employer's use of the exemption even though its employee handbook contained a provision very similar to IMS's. *Auer v. Robbins*, 519 U.S. 452, 462 (1997). The *Auer* Court reasoned that since the handbook provision did not single out employees in the Plaintiffs' category, it created no particular likelihood that improper deductions would be applied to them. *See id.* The Court further concluded that a single incidence of a plaintiff's pay being docked "under unusual circumstances" was insufficient to establish such a likelihood. *See id.*

*Auer* is, however, easily distinguished from the instant case. While IMS' written policy was similar to that in *Auer*, IMS' actual practices of docking purportedly exempt employees easily eclipses the one "unusual circumstance" deduction in *Auer*. As noted above, the record shows at least twelve instances of IMS docking the pay of nominally exempt employees in Plaintiffs' department, including seven instances of actually docking two of the Plaintiffs' pay. These occurred over a period of at least a year, from mid-2003 to mid-2004. And while the precise number of employees in Plaintiffs' department is unclear, Defendants have previously provided a good faith estimate in the range of approximately 50 employees. (Transcr. Sept. 15, 2005, Hearing, at 6.) Thus, for a substantial amount of the time that IMS classified Plaintiffs as exempt, IMS improperly docked the pay of a substantial proportion of the employees in Plaintiffs' department, including two of the Plaintiffs themselves. Obviously, for those two Plaintiffs, they were subject to an "actual practice" of pay deductions. For the other three Plaintiffs, the Court finds that IMS's written policy, combined with its substantial history of docking employees in the Internal department, is more than sufficient to create a "significant likelihood" that each of the Plaintiffs would incur improper deductions.

Additionally, although it is not central to the Court's holding, the Court is also mindful that the above-noted practices

comprised only a portion of IMS's improper docking of purportedly exempt employees' pay. In the Sales department, IMS prolifically disciplined such employees through pay deductions or threats thereof. By the Court's count, IMS disciplined in this manner approximately 24 Sales employees for a wide array of reasons, including dress code violations, attendance issues, productivity problems, poor work product quality, failure to meet sales quotas, tardiness, and general violations of company policy. Although Defendants challenge the relevancy of the Sales employees, as noted above, IMS's written discipline policy applies to all employees, including all exempt employees in all departments. Thus, the fact that IMS regularly uses pay deduction as a means of disciplining exempt employees in the Sales department provides additional support for the Court's finding that those Plaintiffs whose pay was not actually docked nevertheless faced a "significant likelihood" of docking. The Court reemphasizes, however, that it finds an improper pay-docking policy and practice based solely on the evidence of IMS's treatment of employees in the Internal department, including the Plaintiffs.

### 2. *Plaintiffs' IWPCA Claims (Count IV)*

Plaintiffs seek summary judgment on two of their IWPCA claims. One arises from Defendants' failure to pay Plaintiffs consistent with an alleged agreement that their salaries would be based on a 37.5-hour work week during the period when IMS classified

Plaintiffs as exempt from overtime requirements.  The other arises from Defendants' alleged failure to pay Plaintiff Bartelmey her final paycheck following her termination.

*a.   Compensation Based On A 37.5 Hour Work Week*

The IWPCA requires payment of "any compensation owed an employee by an employer pursuant to an employment contract between the two parties, whether the amount is determined on a time, task, piece, or any other basis of calculation."   820 ILCS 115/2. Plaintiffs contend that when IMS switched them to salaried pay, they were told that their pay was based on a 37.5 hour work week, and that this statement formed an employment contract.

The Court denies summary judgment on this claim because there is significant factual dispute whether there was ever a meeting of the minds between Plaintiffs and IMS that Plaintiffs would be paid above and beyond their salary amounts for hours worked beyond 37.5 hours per week.  Plaintiffs testified that IMS represented to them that their salaries assumed a 37.5 hour work week.  But Kazor and other IMS personnel deny making any such representation, and affirmatively state that IMS did not tie salaries to any specific number of hours.   Plaintiffs seek summary judgment nevertheless based on Defendants' judicial admission that IMS "calculated Plaintiffs' salaries based on the assumption that they worked 37.5 hours per week."  But the fact that an employer makes assumptions about hours worked in order to calculate salary amounts does not in

itself, without specific communication to employees (about which there is manifest factual dispute), contractually obligate the employer to pay employees additional amounts for every hour worked above the baseline assumption.

### b. *Bartelmey's Final Paycheck*

Plaintiffs seek summary judgment that Defendants must pay Bartelmey her final paycheck from her first stint with IMS. During the week before she resigned in March of 2002, Bartelmey worked 11.75 hours but did not receive full compensation for these hours after the termination of her employment. Defendants do not deny that Bartelmey worked these hours, nor that IMS did not pay her for all of them. Instead, Defendants assert that she failed to notify them of the problem within five days, and that IMS actually overpaid her on the whole during this time period.

Summary judgment is appropriate here because the IWPCA expressly entitles Bartelmey to full payment of her final compensation. The relevant provision of the IWPCA, 820 ILCS 115/5, provides that "[e]very employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee." Contrary to Defendants' suggestion, there is no five-day notice requirement or any other limitation. Whether or not IMS generally overpaid Bartelmey is a separate

question implicating Defendants' counterclaim, which the Court addresses below.

### 3. *Defendants' Counterclaim*

Plaintiffs seek summary judgment on Defendants' counterclaims related to overpayments IMS allegedly made on certain of Plaintiff Ergo's, Saenger's, Bartelmey's, and Pratali's paychecks. Plaintiffs argue both that Defendants have not produced evidence to show a breach of contract and that recovery is precluded in any case under the "voluntary payment doctrine." Defendants contest Plaintiffs' arguments and additionally argue that their counterclaim is based in unjust enrichment in addition to breach of contract.

#### a. *Breach Of Contract*

Defendants claim that IMS had an oral contract with all of its employees, including Plaintiffs, that included the obligation to return to IMS any inadvertent overpayments. The Court finds, however, that Defendants' evidence cannot support this contention.

To establish breach of contract, one must prove: 1) the existence of a contract between plaintiff and defendant; 2) performance by the plaintiff of the conditions imposed on him by the contract; 3) breach of the contract by the defendant; and 4) damages resulting from the breach. *Bensdorf & Johnson, Inc. v. Northern Telecom Ltd.*, 58 F.Supp.2d 874, 877 (N.D. Ill. 1999). Additionally, the asserted contract must contain "terms

[ ]sufficiently definite and certain so that a court can determine what the agreement was and what conduct constituted a breach." *Id.*

Defendants cite two pieces of evidence in defense of their counterclaim. First is Kazor's deposition testimony that "[t]here was written and oral contracts" covering "hours to be worked," "responsibilities," "pay," "exempt status," and "just lots of things." Second is Kazor's statement in a declaration submitted in response to the instant motion for summary judgment that "there was an oral agreement between IMS and its employees which included the obligation . . . on the part of Plaintiffs to return any overpayments. . . ."

This evidence does not create a genuine fact issue regarding contract formation. To begin with, the above statements by Kazor are essentially legal conclusions, not factual testimony. Nowhere does Kazor or anyone else testify to any specific conversations between IMS management and any of the Plaintiffs in which the alleged oral contract could have been formed. Secondly, even if Kazor's deposition testimony took the form of reporting specific conversations, it fails to even establish that an obligation to return overpayments was a term in any contract formed through such conversations. Kazor did not mention the alleged overpayment term until his late-submitted declaration, the admissibility of which Plaintiffs have challenged. And even there, Kazor again made only

a general assertion, rather than reporting any particular conversations.

For the sake of completeness, the Court also here notes that the IMS employee handbook could not have formed the basis for a contract, as it is undisputed that its expressly disclaims this possibility.

The Court also concludes that the "voluntary payment doctrine" provides an additional basis for summary judgment on Defendants' counterclaim. Under this doctrine, a plaintiff who voluntarily pays money in reply to an incorrect or illegal claim of right cannot recover that payment unless he can show fraud, coercion, or mistake of fact. *Randazzo v. Harris Bank Palatine, N.A.*, 262 F.3d 663, 666 (7th Cir. 2001). Defendants' only argument against application of this doctrine is their contention that they were not aware of the alleged overpayments until they examined payroll records during the discovery phase of this action. But it is undisputed that IMS has possessed all relevant information, including Plaintiffs' time and payroll records, all along. And failure to recognize error in making a voluntary payment does not constitute mistake of fact under the doctrine when the relevant facts were not obscured or inaccessible. *Harris v. ChartOne*, 362 Ill.App.3d 878, 882 (5th Dist. 2005).

### b. Unjust Enrichment

In their response brief, Defendants contend that even if the contract claim fails, they are still entitled to recovery of the alleged overpayments under an unjust enrichment theory. Plaintiffs counter that Defendants cannot recover for unjust enrichment because they never even pled that cause of action. To this end, Plaintiffs point out that the counterclaim contains four counts, each of which is labeled "breach of contract." Plaintiffs further argue that, although the phrase "unjust enrichment" does appear in a few places, that alone does not suffice to satisfy notice pleading requirements. The Court does not, however, need to resolve the adequacy of Defendants' pleadings, since the "voluntary payment doctrine" discussed above would preclude recovery in any case.

### 4. Damages

Plaintiffs have moved for summary judgment on a number of damages-related issues, including the amount of overtime owed, the applicability of liquidated damages, and the willfulness of Defendants' violations. But Plaintiffs also acknowledge that they "do not expect the Court to issue a ruling on damages if it does not grant their motion as to liability." In light of the Court's finding of outstanding liability issues, the Court thus denies as premature summary judgment on these damages issues.

### 5. *Joint Liability*

Finally, Plaintiffs seek summary judgment on their contention that Kazor is individually liable and jointly liable with IMS. Defendants have not contested this point, and so the Court grants summary judgment on it.

## B. Defendants' Motion For Summary Judgment

Defendants move for summary judgment on Plaintiffs' claims under the anti-retaliation provisions of the IMWL and FLSA (Counts III and V, respectively), as well on Plaintiffs' IWPCA claim related to accrued vacation pay (Count IV). Because Plaintiffs have voluntarily dismissed Counts III and IV, the Court need only address Count V, Plaintiffs' FLSA retaliation claims.

### 1. *Factual Summary*

Each Plaintiff alleges that she complained about or protested IMS's pay practices and consequently suffered various forms of retaliation, including firing or "constructive discharge." Because each Plaintiffs' allegations regarding these issues vary, the Court will here separately summarize the facts underlying each Plaintiff's claim.

#### a. *Giselle Ergo*

Plaintiff Ergo alleges that she complained on several occasions in 2003 and 2004 about not being paid for all hours worked. Specifically, Ergo claims that she protested IMS's Saturday work policy, which Plaintiffs contend required employees

to work Saturdays without pay.  Ergo contends that she protested this practice by refusing to come in on Saturdays.  She also testified that she verbally complained following a mid-2004 meeting about Saturday work by asking members of IMS management whether the employees would be paid, which question went unanswered.  She also testified that she complained to Kazor in April 2004 that she had worked over the 44-hour cap even though she knew she would not be paid for it.  She further contends that she complained, again in April 2004, to an IMS manager about not being allowed to take a lunch break.

Ergo claims that IMS punished her for her refusal to work Saturdays without pay first by taking away her office in early 2004.  She claims that IMS further retaliated against her in April 2004 when Kazor informed her during a performance review that IMS was denying her a raise at least partly because of her refusal to work Saturdays.  Ergo also testified that in April 2004, IMS suspended her without pay, and that Kazor informed her in a meeting that she had been suspended because she did not work Saturdays.  Ergo additionally contends that IMS's August 5, 2004, termination of her, Saenger, and Pratali, was retaliation.  Finally, Ergo alleges a number of post-termination acts of retaliation, including IMS's alleged refusal to pay her vacation time and Kazor's allegedly calling her a "cancer" to her former co-workers.

Ergo also contends that Kazor retaliated against her in September 2004 by harassing her and suing her husband, John Ergo. According to Ergo, prior to her termination, Kazor and John Ergo, who is a contractor, had been trying to resolve a dispute over remodeling work that John Ergo had performed in Kazor's bathroom. Ergo claims that, as part of his retaliation against her for complaining at work, Kazor stopped trying to resolve his dispute with her husband and instead initiated suit against him.

Finally, Ergo additionally claims that Defendants retaliated against her after she filed the instant action by both threatening to file a baseless counterclaim and then actually filing one.

### b. Cindee Saenger

Plaintiff Saenger alleges that she made a number of complaints about IMS's pay practices. She testified that when she was classified nonexempt, prior to the end of 2002, she complained to Human Resources that she was not being paid for hours she worked beyond 44 per week. Saenger also testified that, after IMS switched her to salaried status, she complained to an IMS manager, and to Kazor himself, that her new salary was not actually a raise because she was not being compensated for all her overtime. Saenger also claims that she complained to IMS management in early 2004 that she and other employees had been working on Saturdays without pay. Finally, Saenger claims that she complained to an IMS

manager on August 3, 2004, about her sick days being charged as vacation days.

Saenger alleges that IMS retaliated against her in a number of ways. First, she claims that Defendants responded to her complaints about the 44-hour cap by accusing her, along with three other of the plaintiffs, of "milking the company for overtime." Next, she claims that IMS denied her a promotion to office manager in early-mid 2004 because of her complaints. Sanger additionally contends that IMS's August 5, 2004, termination of her, Ergo, and Pratali, was retaliation. Finally, Saenger alleges the same post-termination acts of retaliation as Saenger and Pratali: withholding of vacation pay, calling her a "cancer" to her former co-workers, as well as Defendants' threatened and actually-filed counterclaims against Plaintiffs.

### c. Lisa Pratali

Plaintiff Pratali alleges that she complained of Defendants' pay practices to IMS management and other IMS employees in 2004. She claims that she complained to a manager that her paycheck was wrong after she was put on salary. She also claims that she complained to IMS's director of accounting in mid-2004 that she was not getting paid for all hours worked, and that she and other employees were required to work Saturdays without pay.

According to Pratali, during 2004, she also often complained to other IMS employees, including a newly hired employee, Rebecca

Vaughn, about having to work late and on Saturdays for no extra pay. Pratali alleges that Vaughn resigned because of Pratali's complaints to her. Vaughn's resignation email indeed indicates that she resigned because of information she learned about working late and on Saturdays. Another series of emails also reflects IMS management's awareness of Pratali's conversations with Vaughn.

Pratali contends that IMS's termination of her employment, along with Ergo's and Saenger's, within a week of Vaughn's resignation, was retaliation for her complaints. Like the other plaintiffs, Pratali also contends that IMS retaliated against her by refusing to pay her accrued vacation time and by filing and threatening to file counterclaims against Plaintiffs. Finally, Pratali, like Saenger and Ergo, contends that Kazor retaliated against her after her termination by calling her a "cancer" to her former co-workers.

### d. *Erica Bartelmey*

Plaintiff Bartelmey alleges that she complained about IMS's pay practices during both of her tenures with the company. During her first stint, in early 2002, she alleges that she complained to office manager Katie Anderson about being required to lie during a Department of Labor audit of IMS about whether she was aware of any employees not being paid for all their work. Bartelmey claims that she again complained to Anderson in March 2002 that she was not being paid for all her hours under the 44-hour cap.

According to Bartelmey, she suffered retaliation from these 2002 complaints. Specifically, she alleges that Anderson "attacked and yelled at" Bartelmey when Bartelmey raised her pay concerns. Bartelmey also claims that, after her 2002 resignation, she complained to Plaintiff Andres, who was still working at IMS, that IMS had not paid her her accrued vacation.

During Bartelmey's second stint with IMS, which began in November 2002, she claims she made further complaints and faced further retaliation. According to Bartelmey, she complained to IMS management that IMS's switching her to salary resulted in her taking a pay cut because of the unpaid overtime. Bartelmey also says that she complained that IMS had deducted one-and-a-half days of her pay, which she understood was not supposed to happen to salaried employees. Bartelmey further claims that, "a couple months" before her eventual termination, she complained about being required to use vacation days when she was sick.

Like the other plaintiffs, Bartelmey also alleges that she complained about being required to work Saturdays without pay. She testified that in 2003 and 2004 she complained to members of IMS's "advisory board," as well as to at least one manager, about the contradiction of "mandatory voluntary" Saturday work.

Additionally, Bartelmey claims that she complained about her March 31, 2004, suspension without pay, which arose from what Bartelmey contends was a false accusation by IMS that Bartelmey had

been viewing pornographic material on an IMS computer.  According to Bartelmey, IMS's information technology department was unable to find any evidence that Bartelmey had in fact viewed pornography, and Bartelmey explained to her supervisor that she had only checked her personal email.  Bartelmey claims that IMS nevertheless suspended her for one day's pay, which was extended to three days after Kazor became involved.  Bartelmey testified that when she returned to work, a manager told her that she would be suspended for an additional "day or two," that her pay would be further docked, and that she would no longer have a computer password.  Then, according to Bartelmey, when the manager presented her with "write-ups" of the incident to sign, Bartelmey objected to the discipline, refused to sign the documents, and was sent home again.

Bartelmey alleges several forms of retaliation during her second tenure with IMS.  Most prominently, she contends that IMS fired her shortly after she objected to the above-described discipline.  The firing, according to Bartelmey, also occurred not long after she had complained about Saturday work.  As with the other Plaintiffs, Bartelmey also contends that IMS's withholding of her vacation pay, along with Defendants' threatened and actually-filed counterclaims, constituted further retaliation.

### e.  *Rhonda Andres*

Plaintiff Andres claims that she complained about IMS's pay practices throughout her employment there, and that Defendants

retaliated against her by making her working conditions so intolerable that she had no choice but to resign. Andres claims that when she was a receptionist she complained about not being paid for all of her hours under the 44-hour cap. She contends that when IMS later placed her in the Accounting department, Andres repeatedly complained to Kazor and Katie Anderson about the cap and about the manner in which IMS was classifying workers as exempt or nonexempt. Andres also claims that she complained to IMS management that it was improper to withhold severed employees' vacation pay. According to Andres, IMS ignored her complaints, and Kazor directed her to make "mistakes" on the paychecks of serially tardy employees.

Andres contends that the stress from IMS's allegedly unlawful practices and her forced involvement in them ultimately caused her to resign from IMS. Specifically, Andres claims that the stress she experienced at IMS caused loss of sleep and aggravated her Multiple Sclerosis, and that her resignation thus constituted "constructive discharge." Andres further claims that after she resigned, as with the other Plaintiffs, Defendants retaliated against her by withholding her vacation pay, and by threatening to file, and actually filing, baseless counterclaims against Plaintiffs.

## 2. Discussion

The FLSA's anti-retaliation provision, 29 U.S.C. § 215(a)(3), provides that it is unlawful for an employer "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to the [the FLSA]." *Id.* FLSA plaintiffs can prove retaliation under 215(a)(3) in two ways: the "direct" and "indirect" methods. Under the direct method, the plaintiff must show that she engaged in a protected activity and, as a result, suffered an adverse employment action. *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 902 (7th Cir. 2006). This can be shown through either direct or circumstantial evidence. *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 720-21 (7th Cir. 2005).

The indirect method of proving retaliation, by contrast, involves a burden-shifting scheme in which the plaintiff must first state a prima facie case of retaliation by showing that she complained of unlawful wage practices, that no other similarly situated employee who did not complain was subject to an adverse action, and that she was performing her job satisfactorily. *Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002). The defendant must then present unrebutted evidence of a legitimate reason for the adverse action. *Id.*

Defendants argue that Plaintiffs' evidence fails under both the direct method and indirect methods. With regard to the direct method, Defendants argue that Plaintiffs have not established engagement in "protected activity," "adverse employment actions," or a causal connection between Plaintiffs' alleged complaints and the termination of their employment. With regard to the indirect method, Defendants argue that Plaintiffs have failed to state a prima facie case and that, in any case, Defendants had legitimate reasons for any adverse employment actions.

### a. Direct Method

Defendants generally attack Plaintiffs' attempts to establish each element under the direct method. Where possible, the Court will address Defendants' arguments as collectively applying to all the Plaintiffs. To the extent that some of Defendants' arguments only apply to certain of the Plaintiffs, the Court will note the fact and separately address those arguments.

### (1) Protected Activity

Defendants contend that Plaintiffs' complaints do not constitute "protected activity" within the meaning of the FLSA. Defendants rely on a plain-language interpretation of the FLSA's pronouncement that an employer "may not discharge or in any other manner discriminate against any employee because such employee has filed any complaint or caused to be instituted any proceeding under or related to [the FLSA]. . . ." 29 U.S.C. § 215(a)(3).

Defendants read this language to mean that Section 215(a)(3) only provides a cause of action for retaliation if the employee has filed a "formal" complaint. It is unclear how "formal" a complaint would need to be under Defendants' statutory interpretation, but Defendants do read the statute to exclude the sort of oral complaints made to supervisors and co-workers in the ordinary course of employment that Plaintiffs here allege. Defendants also alternatively argue that, even if informal complaints can satisfy Section 215(a)(3), they must be accompanied by some affirmative action adverse to the employer.

The Court rejects Defendants' interpretation of 215(a)(3). Although Defendants present a fair reading of the statute's plain language, Section 215(a)(3) "has been construed broadly." *Crowley v. Pace Suburban Bus Div. of Regional Transp. Authority*, 938 F.2d 797, 798 n.3 (7th Cir. 1991). Indeed, the First, Third, Sixth, Ninth, Tenth, and Eleventh Circuits have all held that informal, internal complaints can support FLSA retaliation claims. *See Valerio v. Putnam Associates, Inc.*, 173 F.3d 35, 41 (1st Cir. 1999); *Brock v. Richardson*, 812 F.2d 121, 124-25 (3rd Cir. 1987); *E.E.O.C. v. Romeo Community Schools*, 976 F.2d 985, 989-90 (6th Cir. 1987); *Lambert v. Ackerley*, 180 F.3d 997, 1002-08 (9th Cir. 1999); *Connor v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1394 (10th Cir. 1997); and *E.E.O.C. v. White and Son Enterprises*, 881 F.2d 1006, 1011-12 (11th Cir. 1989). Indeed, to date, it appears that the

only appeals court to hold otherwise was the Second Circuit, which did so in a case where the employee had arguably not asserted a statutory right at all.  *See Lambert v. Genesee Hosp.*, 10 F.3d 46, 55 (2nd Cir. 1993) (holding that one general complaint to employer that the way employee was paid was "not fair," without any reference to discrimination, could not support retaliation claim).  Although the Seventh Circuit has not expressly ruled on the issue, district judges in this district have overwhelmingly followed the majority view that informal complaints can constitute "protected activity" under the FLSA.  *See, e.g., Skelton v. American Intercontinental University Online*, 382 F.Supp.2d 1068 1076 (N.D. Ill. 2005); and *Wittenberg v. Wheels, Inc.*, 963 F.Supp. 654, 658 (N.D. Ill. 1997).

The rationale underlying the majority view, that the FLSA's broad, remedial purposes must yield a broad interpretation of Section 215(a)(3), has been fully articulated in the above-noted decisions.  As such, this Court will not belabor the point here. Suffice it to say that this Court accepts the majority view and reads Section 215(a)(3) to encompass informal complaints an employee makes to his or her supervisors.

Summary judgment is thus unwarranted on this issue, as there is at least a genuine factual dispute that each Plaintiff complained in some relevant way about Defendants' pay practices. There is, for example, testimony that each Plaintiff spoke to Human

Resources, a supervisor, a manager, or to Defendant Kazor himself about various pay issues, including Saturday work, the 44-hour cap, and the switch to salary. Although Defendants dispute whether certain purported complaints can really be characterized as complaints, the Court is not willing to declare *a priori* that "X constitutes a complaint, while Y does not." It is the jury's province to evaluate the credibility of the testimony and the contexts in which Plaintiffs claim to have complained.

(2)  Adverse Employment Actions

Defendants also seek summary judgment based on the "adverse employment action" prong of Plaintiffs' direct method case. Defendants contend that most of the conduct Defendants are alleged to have engaged in cannot, as a matter of law, constitute adverse employment action. Specifically, Defendants single out several of Defendants' alleged actions as being simply not harmful enough to constitute retaliation. Defendants also argue that failing to pay Plaintiffs accrued vacation time cannot constitute retaliation, nor can filing or threatening to file compulsory counterclaims. Finally, Defendants contend that Plaintiff Andres cannot establish an adverse employment action arising from her resignation from IMS.

(a)  *Level of Harmfulness*

Defendants contend that the following of their alleged actions are per se too minor to constitute "adverse employment actions": the taking away of Ergo's office; Kazor's statement that Ergo,

Pratali, and Saenger were "a cancer"; Anderson's accusation that Saenger was "milking the company"; and Kazor's and other's accusation that Bartelmey was viewing pornography at work.

In order for an employer's actions to constitute "adverse employment actions," they must be actions that "would have been materially adverse to a reasonable employee," which means, "harmful to the point that they could well dissuade a reasonable worker from [engaging in protected activity]." *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2409 (2006). It is logical and well established that, generally speaking, this sort of reasonable person analysis is poorly suited to summary disposition because it necessarily involves complex factual questions. *Thames v. Maurice Sporting Goods, Inc.*, 686 F.Supp. 208, 213 (N.D. Ill. 1988). At the same time, the Court is mindful that anti-retaliation law "does not set forth 'a general civility code for the American workplace.'" *Burlington Northern*, 126 S.Ct. at 2415 (citation omitted).

With these standards in mind, the Court concludes that certain of Defendants' alleged actions are indeed too minor to form the basis of a retaliation claim. Specifically, "'courts have held that personality conflicts at work that generate antipathy' and 'snubbing by supervisors and co-workers' are not actionable." *Id.* (citation omitted). In keeping with this limit, the Court concludes that Plaintiffs' allegations of accusation and name-

calling cannot support liability under the FLSA's retaliation provision. Thus, summary judgment is appropriate as to Kazor's alleged "cancer" comment, Anderson's alleged "milking the company" comment, and the accusation that Bartelmey was viewing pornography at work (note, however, that the Court does not intend to preclude any attempt by Bartelmey to prove retaliation through the events that flowed from this accusation, including her suspension and firing).

The Court also concludes, however, that the harm of taking away of Ergo's office should be evaluated by the jury. Although the taking away of an office would seem to be on the minor end of the scale of possible retaliatory actions, it is difficult to conclude that there is no circumstance under which a reasonable person would find that action to be troublesome enough to dissuade him or her from complaining of improper pay practices. *Cf. Burlington Northern*, 126 S.Ct. at 2416 (noting that "the real social impact of workplace behavior depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed").

### (b)  Accrued Vacation Time

Defendants argue that Plaintiffs cannot assert retaliation arising from IMS's withholding of Plaintiffs' vacation pay because Plaintiffs have now dismissed their substantive IWPCA claim related

to the vacation pay issue. Defendants argue that Plaintiffs are essentially trying to amend their complaint to add a retaliation claim that was not previously at issue in this case. But Defendants have clearly understood all along that the vacation pay issue was relevant to the retaliation claims as well as the IWPCA claim. For example, in their memorandum supporting their motion for summary judgment, Defendants argued that because "none of the Plaintiffs complained of the **nonpayment of their accrued vacation**," it is "impossible for Plaintiffs to even assert, let alone prove, a claim of **retaliatory discharge**. . . ." (emphasis added). The Court thus finds no unfairness in Plaintiffs continuing to argue that IMS's withholding of vacation pay was retaliatory, even though Plaintiffs have dropped their IWPCA claim related to the issue.

### *(c) Defendants' Litigation*

Defendants argue that Plaintiffs, as a matter of law, cannot establish FLSA retaliation arising from Defendants' counterclaim against Plaintiffs in this case, from a counterclaim they threatened to file but did not file against Plaintiffs, or from Kazor's suit against John Ergo.

First, with regard to the counterclaim, "it will be the rare case in which conduct occurring within the scope of litigation constitutes retaliation. . . ." *Steffes v. Stepan Co.*, 144 F.3d 1070, 1075 (7th Cir. 1998). The filing of a compulsory counterclaim is a particularly unlikely basis for a retaliation

claim for a number of reasons: the FLSA plaintiff will have already asserted his or her rights, it will not cause the plaintiff to hire a lawyer or incur significant additional expenses, and (most significantly) the Defendant must bring compulsory counterclaims or risk waiving them. *See Beltran v. Brentwood North Healthcare Center, LLC*, 426 F.Supp.2d 827, 834 (N.D. Ill. 2006). Indeed, the only circumstance in which the filing of a compulsory counterclaim might constitute retaliation is where the counterclaim is totally baseless. *Id.*

The Court is unwilling to conclude that Defendants' counterclaim is baseless. Although the Court has concluded that summary dismissal of the filed counterclaim is appropriate, that is not equivalent to stating that it is baseless, which is to say frivolous (and therefore sanctionable). Especially since an employer that fails to assert legitimate claims against an employee arising from the same transaction as the employee's FLSA complaint would waive those claims, the threshold for concluding that a compulsory counterclaim is retaliatory should be high. Here, Defendants have at least pointed to testimony (albeit self-serving), the employee handbook, and a plausible claim that Defendants were ignorant of any overpayments to Plaintiffs until discovery in this suit. It is not much, but the Court finds that it overcomes the "baselessness" threshold.

Second, with regard to Defendants' threatened but unfiled counterclaim, the Court is not convinced that such an action could ever constitute retaliation in this context. As noted above, conduct occurring within the scope of litigation will only constitute retaliation in rare cases. *Steffes*, 144 F.3d at 1075. At least where a counterclaim has been threatened only after the employee has already filed his or her complaint, threatening to file a counterclaim would not chill the employee's assertion of rights. Here, Defendants' alleged counterclaim threat occurred after a failed mediation of Plaintiffs' complaint. To the extent the threat was improper and could have harmed Plaintiffs' ability to advanced their claims, it would be a matter to be resolved by court rules, not by the FLSA. *Cf. id.* at 1076.

As for Plaintiffs' retaliation claim based on Kazor's suit against John Ergo, summary dismissal is also appropriate. The Supreme Court has held that the filing and prosecution of a lawsuit may not be enjoined as an unfair labor practice unless it is motived by retaliatory animus and the suit is baseless. *Bill Johnson's Restaurant, Inc. v. National Labor Relations Board*, 461 U.S. 731, 743-744 (1983). Although *Bill Johnson's* involved retaliation under the National Labor Relations Act ("NLRA"), the Court sees no principled distinction between that case and the facts presented here. Both involve the weighing of an employer's

First Amendment rights to access to the courts against employees'
needs to assert statutory rights.

Consequently, in order to survive summary judgment, Plaintiffs
here must put forth evidence establishing a genuine issue of
material fact that Defendant Kazor's suit against John Ergo was
retaliatory and baseless. *See id.* But Plaintiffs' only real
evidence regarding the Kazor/John Ergo suit is that Kazor filed it
after Plaintiffs' filed the instant action. There is no other
evidence regarding the motivation for or the merit of Kazor's suit.
Indeed, Plaintiff Ergo repeatedly stated in her deposition that she
is unaware of or does not recall the details of the dispute between
her husband and Kazor. Especially since Kazor's dispute with John
Ergo originated well before the instant litigation, the Court finds
that the mere temporal sequence of complaint filings is an
insufficient basis on which to find retaliatory motive. And the
complete absence of evidence regarding the merits of Kazor's suit
against John Ergo likewise precludes a finding of baselessness. As
such, summary judgment on this issue is appropriate.

*(d)  Plaintiff Andres' Claim of Constructive Discharge*

Defendants argue that Plaintiff Andres has failed to establish
that the circumstances of her resignation can support an "adverse
employment action" finding. Andres contends that, although
Defendants did not fire her, they made her working conditions so

intolerable as to constitute "constructive discharge," which can be an adverse employment action.

The Court concludes that summary judgment is appropriate on Andres' constructive discharge claim. Establishing constructive discharge requires showing that (1) working conditions were so intolerable that a reasonable person would have been compelled to resign, and (2) there was a causal connection between those conditions and a protected activity. *See Simpson v. Borg-Warner Automotive, Inc.*, 196 F.3d 873, 877 (7th Cir. 1999). Plaintiff fails on both accounts. First, the Seventh Circuit has set a high bar for designating employer actions so objectively intolerable as to compel resignation. Generally, the actions held to be so intolerable have involved extreme conduct including death threats and physical assault, while "unpleasant and even embarrassing" actions have consistently been held to be tolerable. *See id.* (collecting cases). Defendants' alleged actions here fall much more in line with the latter category than the former. Having one's complaints ignored and being made to make "mistakes" on co-workers paychecks may be unpleasant, but it does not rise to the level the Seventh Circuit has previously found to be intolerable.

Second, Andres' evidence does not establish that Defendants' allegedly intolerable actions were causally linked with Andres' complaints. Nothing in the record suggests that the circumstances that allegedly caused Andres to quit – IMS's unlawful pay

practices, having to enforce them, and having her complaints ignored – would not have been present if she had not complained about Defendants' alleged wage practices. Indeed, it is counterintuitive that Defendants would respond to Andres' complaints about their allegedly unlawful practices by increasing her involvement in them, rather than distancing her from them. Especially since Andres' testimony does not identify with any specificity the temporal sequence of complaints and the creation of the assertedly intolerable working conditions (which appear to have been present more or less all along), the Court sees no reasonable basis in the evidence to find constructive discharge.

### (3)  Causal Link

Defendants argue that Plaintiffs cannot, as a matter of law, establish the third prong of the direct evidence method – showing a causal link between their complaints and Defendants' alleged adverse employment actions. In particular, Defendants argue that case law precludes finding a causal link where the protected activity precedes the adverse action by more than a few months. According to Defendants, Plaintiffs' alleged complaints occurred too long before their respective terminations to satisfy the causal link requirement. Defendants also contend that Plaintiffs have not established that the decision makers knew of Plaintiffs' complaints.

The Court rejects Defendants' arguments because Plaintiffs have put forth more than sufficient evidence for a reasonable jury to find for them on the causal link issue. To begin with, "suspicious timing" is only one type of circumstantial evidence that can be used to prove retaliation under the direct method, *see Rudin v. Lincoln Land Community College*, 420 F.3d 712, 720-21 (7th Cir. 2005), and Plaintiffs have offered significant evidence beyond mere timing. Ergo, for example, testified that Kazor specifically told her that one of the reasons she did not receive a raise was her refusal to work Saturdays, for which she contends she would not have been paid. Bartelmey, Saenger, and Pratali, for their parts, contend that, although they were ostensibly fired for taking a group break, other non-complaining employees that took group breaks on the same day they did were not fired. The cases Defendants rely upon, *Sauzek v. Exxon Coal USA, Inc.*, 202, F.3d 913, 918 (7th Cir. 2000), and *Filipovic v. K & R Exp. Systems, Inc.*, 176 F.3d 390, (7th Cir. 1999), are inapposite because in those cases the plaintiff's **only** evidence was that he or she complained and was later fired.

Moreover, the Court does not accept Defendants' characterizations of Plaintiffs' evidence on the timing issue. First, a number of the plaintiffs' alleged complaints occurred much closer to the times of Plaintiffs' terminations than Defendants have suggested. Erica Bartlemey, for example, was fired on

April 6, 2004, and has testified that she complained in early 2004 about "mandatory voluntary" Saturday work and on March 31 and April 6, 2004, about being suspended without pay while being salaried.   And Lisa Pratali alleges that she was fired only one week after members of IMS management, including Kazor, had become aware that her complaints about working late and on Saturdays without pay had caused a new employee to quit. Second, termination is not the only adverse action Plaintiffs have alleged.  As noted above, Ergo asserts that Kazor's decision to deny her a raise was retaliation, as was the taking away of her office.   Thus, to the extent that the relative timing of Defendants' actions vis-à-vis Plaintiffs' complaints is relevant, it must be measured not just by the dates of their terminations, but also by the dates of all the alleged adverse employment actions.   Defendants' argument focuses only on the dates of termination.

b.  <i>The Indirect Method</i>

The indirect method is an alternative means of proving retaliation.  <i>See Stone v. City of Indianapolis</i>, 281 F.3d 640, 644 (7th Cir. 2002).   Consequently, because the Court has concluded that summary judgment is inappropriate with regard to the direct method of proving retaliation as to Plaintiffs Bartelmey, Ergo, Pratali, and Saenger, it is not necessary to resolve Defendants' indirect method arguments as to those Plaintiffs.   And since the Court's partial grant of summary judgment on Plaintiff Andres'

retaliation claim is based on her failure to establish an element that is common to both the direct and indirect methods, the "adverse employment action" requirement, it is likewise unnecessary to further discuss Defendants' indirect method argument with regard to her.

### III.  CONCLUSION

For the reasons stated herein, the Court rules as follows:

1.  Plaintiffs' Motion for Partial Summary Judgment is **GRANTED IN PART** and **DENIED IN PART.**  Specifically, the Court grants Plaintiffs' Motion as to the following issues:  (1) Plaintiffs' claims for overtime pay during the periods when IMS classified each of the Plaintiffs as exempt; (2) Plaintiff Bartelmey's claim that IMS must pay her her final paycheck; (3) Defendants' counterclaim; and (4) Plaintiffs' contention that each Defendant is jointly and severally liable.

2.  The Court denies all other aspects of Plaintiffs' Motion for Summary Judgment.

3.  Defendants' Motion for Partial Summary Judgment is likewise **GRANTED IN PART** and **DENIED IN PART.**  Specifically, the Court grants Defendants' Motion as to the following issues:  (1) Plaintiffs' retaliation claims arising from Kazor's alleged "cancer" comment, Anderson's alleged "milking the company" comment, or the accusation that Bartelmey was viewing pornography at work; (2) Plaintiffs' retaliation claims based on Defendants' threatened

and filed counterclaims or on Kazor's suit against John Ergo; and (3) Plaintiff Andres' retaliation claim based on constructive discharge.

4.     The Court denies all other aspects of Defendants' Motion for Summary Judgment.

**IT IS SO ORDERED.**

_____
        Harry D. Leinenweber, Judge
        United States District Court

**DATE:** September 13, 2007